# CIVIL RIGHTS COMPLAINT FORM

## FOR USE IN ACTIONS UNDER 42 U.S.C. § 1983

### IN THE UNITED STATES DISTRICT COURT FOR THE

### NORTHERN DISTRICT OF FLORIDA

PANAMA CITY   DIVISION

1. ROBERT WILLIAMS, PLAINTIFF ,

2. ,

3. .

(Enter the full name of each plaintiff,
plus inmate number (if applicable).
Begin the name of each plaintiff on a new
line. The entire name of each party
should be in capital letters.
Descriptive terms such as a party's title
or job position should be in normal
case.)

vs.

CASE NUMBER: 5:99cv-224/SPM/SMN
(To be assigned by Clerk)

1. KEITH HALL, WARDEN ,

2. W. S. WILLINGHAM, ASSOCIATE WARDEN ,

3. ,

4. .

(Enter the full name of each defendant in
the same manner as above. If additional
space is required, use the blank area
directly to the right.)

### ANSWER ALL QUESTIONS ON THE FOLLOWING PAGES:

## I.  PLAINTIFFS:

State your <u>full name</u>, inmate number, and full mailing address in the lines below.  Include the name of the institution in which you are confined.  Do the same for any additional Plaintiffs:

    (A)  Plaintiff's name:  <u>ROBERT WILLIAMS</u>

         Plaintiff's inmate number:  <u>18433-018</u>

         Prison or jail:  <u>MARIANNA F.C.I.</u>

         Mailing address:  <u>POST OFFICE BOX 7007</u>

                    <u>MARIANNA, FLORIDA 32447-7007</u>

## II.  DEFENDANTS:

State the <u>full name</u> of the defendant, official position, mailing address, and place of employment.  Do the same for <u>**every**</u> defendant.

(1)  Defendant's name:  <u>KEITH HALL</u>

     Official position:  <u>ASST. DIRECTOR OF HUMAN RESOURCES (EX-WARDEN, FCI MARNA.)</u>

     Mailing address:  <u>320 1st STREET, OFFICE OF HUMAN RESOURCES, WASHINGTON, D.C.  20534</u>

     Employed at:  <u>U.S. DEPARTMENT OF JUSTICE, federal BUREAU OF PRISONS</u>

(2)  Defendant's name:  <u>W.S. WILLINGHAM</u>

     Official position:  <u>ASSOCIATE WARDEN</u>

     Mailing address:  <u>P.O. BOX 7007, MARIANNA, FL.  32447-7007</u>

     Employed at:  <u>F.C.I., MARIANNA, FL.</u>

(3)  Defendant's name:  _____

     Official position:  _____

     Mailing address:  _____

     Employed at:  _____

<u>**ATTACH ADDITIONAL PAGES HERE TO NAME ADDITIONAL DEFENDANTS**</u>

Revised 2/97                              2

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES:

NOTE: THE COURT WILL NOT ACCEPT THE COMPLAINT FOR FILING UNTIL PLAINTIFF(S) FILL OUT THE FOLLOWING REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES. UNDER THE PRISON LITIGATION REFORM ACT OF 1995, 42 U.S.C. § 1997e (AS AMENDED), THIS COMPLAINT IS SUBJECT TO DISMISSAL IF THE CLAIMS PRESENTED HAVE NOT BEEN PROPERLY EXHAUSTED.

A. DOES YOUR COMPLAINT CONCERN EVENTS OCCURRING WITHIN THE FLORIDA DEPARTMENT OF CORRECTIONS?

Yes( )          No(X )

[If your answer is YES, answer all the questions in this subsection. If your answer is NO, proceed to subsection III B.]

Exhaustion of administrative remedies pursuant to Fla. Admin. Code Chapter 33-29 is required prior to pursuing a civil rights action concerning events occurring within the Florida Department of Corrections. Any required grievances, appeals, and responses **must** be submitted to the Court to verify exhaustion. Each plaintiff must complete a separate Section III.

**EXHAUSTION STEPS REQUIRED:**

* Emergency Grievance, Grievance of Reprisal, Grievance of a Sensitive Nature, Medical Grievance, Grievance Concerning Violation of Americans with Disabilities Act (ADA), Medical Grievance, Grievance Involving Admissible Reading Material, Grievance Governed by Fla. Admin. Code Rule 33-11.0065 Incentive Gain Time, Grievance Involving Disciplinary Action.

    a.  Formal Grievance to Superintendent or to the Office of Secretary (Form DC1-303)

    b.  Appeal to the Office of Secretary (Form DC1-303)

* General Grievance

    a.  Informal Grievance (Form DC3-005)

    b.  Formal Grievance (Form DC1-303)

    c.  Appeal to the Office of Secretary (Form DC1-303)

**EXHAUSTION STEPS TAKEN:**

1. Emergency Grievance, Grievance of Reprisal, Grievance of a Sensitive Nature, Medical Grievance, Grievance Concerning Violation of Americans with Disabilities Act (ADA), Grievance Involving Admissible Reading Material, Grievance Governed by Fla. Admin. Code Rule 33-11.0065 Incentive Gain Time, Grievance

Involving Disciplinary Action (these are requests for Administrative Remedy or Appeal, by-passing the informal grievance step).

    a.   Did you submit your grievance directly to the Superintendent and/or to the Office of Secretary (Form DC1-303)?

        N/A  Yes( )               No( )

    b.   If so, you must attach a copy of the grievance and response to this complaint form.

    c.   Were you denied emergency status or otherwise required to first file an informal grievance?

        N/A  Yes( )               No( )

    d.   Did you have a disciplinary hearing concerning this matter?

        N/A  Yes( )               No( )

    e.   If so, you must attach a copy of the disciplinary report and disciplinary committee's findings and decision to this complaint form.

2.   Informal Grievance (Request for Interview)

    a.   Did you submit an informal grievance (Form DC3-005)?

        N/A  Yes( )               No( )

    b.   If so, you must attach a copy of the grievance and response to this complaint form.

3.   Formal Grievance (Request for Administrative Remedy or Appeal)

    a.   Did you submit a formal grievance (Form DC1-303)?

        N/A  Yes( )               No( )

    b.   If so, you must attach a copy of the grievance and response to this complaint form.

4.   Appeal to the Office of the Secretary (Request for Administrative Remedy or Appeal)

    a.   Did you submit an appeal to the Office of the

Secretary (Form DC1-303)?

N/A  Yes( )                         No( )

      b.    If so, you must attach a copy of the appeal and response to this complaint form.

B. DOES YOUR COMPLAINT CONCERN EVENTS OCCURRING WITHIN A COUNTY JAIL?

Yes( )                         No(X)

If your answer is YES, answer the following questions.

1.   Is there a grievance procedure at your institution or jail?

N/A  Yes( )                         No( )

2.   Did you present the facts relating to your complaint in the prison grievance procedure?

Yes(X)                         No( )

3.   If your answer is YES:

      a.    What steps did you take? ADMINISTRATIVE REMEDY PROCESS.

      b.    What were the results? DENIED ON ALL LEVELS.

4.   If your answer is NO, explain why not:

## IV.  PREVIOUS LAWSUITS

NOTE: UNDER THE PRISON LITIGATION REFORM ACT OF 1995, 28 U.S.C. § 1915 (AS AMENDED), NO PRISONER SHALL BRING A CIVIL ACTION OR APPEAL A JUDGMENT IN A CIVIL ACTION UNDER 28 U.S.C. § 1915 IF THE PRISONER HAS, ON 3 OR MORE PRIOR OCCASIONS, WHILE INCARCERATED OR DETAINED IN ANY FACILITY, BROUGHT AN ACTION OR APPEAL IN A COURT OF THE UNITED STATES THAT WAS DISMISSED ON THE GROUNDS THAT IT IS FRIVOLOUS, MALICIOUS, OR FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED, UNLESS THE PRISONER IS UNDER IMMINENT DANGER OF SERIOUS PHYSICAL INJURY.  THEREFORE, IT IS EXTREMELY IMPORTANT THAT THIS SECTION BE COMPLETED IN **THE MOST TRUTHFUL AND COMPLETE MANNER POSSIBLE**.  FAILURE TO GIVE COMPLETE AND TRUTHFUL INFORMATION ABOUT PRIOR CASES CAN RESULT IN THE **DISMISSAL** OF THIS ACTION.

      A.    Have you initiated other actions in **state** court dealing with the same or _similar_ facts or issues as involved in this action?     Yes( )     No(X)

B.   Have you initiated other actions in **federal** court dealing
     with the same or <u>similar</u> facts or issues as involved in
     this action?        Yes( )    No(X)

C.   If your answer to either (A) or (B) is YES, describe each
     action in the space provided below.  If there is more
     than one action, describe all additional actions on a
     separate piece of paper, using the same format as below.

     (1)  Parties to previous action:

          Plaintiff(s):
          Defendant(s):

     (2)  Court (if federal court, name the district; if
          state court, name the county):

     (3)  Docket Number:

     (4)  Name of Judge:

     (5)  Briefly describe the facts and basis of the action:

     (6)  Disposition (Was the case dismissed?  If so, why?
          Did you appeal?  What result?):

     (7)  Approximate filing date:

     (8)  Approximate disposition date:

D.   Have you initiated other actions (other than those listed
     in (A) or (B)) in state or federal court relating to the
     fact or manner of your imprisonment or the conditions of
     your imprisonment?   Yes( )   No(X)

E.   If your answer to (D) is YES, describe each action in the
     spaces below.  Attach additional pages if necessary.

     (1)  Court (if federal court, name the district; if
          state, name the county):

     (2)  Docket Number:

     (3)  Parties to the previous action
          (a). Plaintiff(s):
          (b). Defendant(s):

     (4)  Basis of action:

     (5)  Is it still pending?   Yes( )   No( )

## V.   STATEMENT OF FACTS:

Using numbered paragraphs, state as briefly as possible the **FACTS** of your case.  Describe how <u>each</u> defendant was involved and what each did or did not do to give rise to your claim.  Include the names of persons involved, dates, times, and places.  State exactly what happened.  **DO NOT make any legal arguments or cite any cases or statutes.**  You may make copies of these pages and attach additional sheets of paper if needed:

    (1) I AM A MEMBER OF AMERICANS FOR MEDICAL RIGHTS. HOWEVER, I DO NOT SMOKE MARIJUANA, NEVERTHELESS, IF IT WAS PRESCRIBED TO ME BY A MEDICAL DOCTOR AS THE BEST TREATMENT WITH THE LEAST SIDE EFFECTS, I CERTAINLY WOULD CONSIDER IT AS A MEDICATION. OF COURSE, I KNOW THAT'S IMPOSSIBLE WHILE INCARCERATED.

    (2) SEE EXHIBIT-A, PROPOSITION 215, A GUIDE FOR MEDICAL MARIJUANA PATIENTS. I SUFFER FROM MUSCLE SPASMS, CHRONIC HIP AND BACK PAIN, PARALYSIS OF BOTH THUMBS AND GREAT TOES, SEVERE ARTHRITIS, NAUSEA, SPINAL CORD INJURIES IN THE LOWER BACK AND NECK, ALSO, OCCASIONALLY MIGRAINES. AND A DIMINISHING EYESIGHT DUE TO MY DIABETIC CONDITION.

    (3) I ORDERED SOME PUBLICATION IN REFERENCE TO THE MEDICAL USE OF MARIJUANA AND THE PUBLICATION COVERS A WIDE VARIETY OF INFORMATION, INCLUDING THE LATEST INFORMATION AVAILABLE ON PROPOSITION 215, HOWEVER, IT ALSO COVERS SECTIONS ON HOW TO GROW PERSONAL MEDICAL MARIJUANA AND THE LEGAL STEPS TO TAKE IF YOU ARE PRESCRIBED MARIJUANA BY A PHYSICIAN. ALSO THE FACT THAT CERTAIN STATES HONOR PROPOSITION 215 LEGALLY.

    (4) APPARENTLY, MY PUBLICATION WAS REJECTED ON OCTOBER 2, 1998. (SEE EXHIBIT-B) I WAS NEVER NOTIFIED AS IS PROCEDURES, INCLUDING NOTIFICATION TO THE PUBLISHER. INMATE, WILLIAM LONG, EVEN THOUGH WE HAVE DIFFERENT NAMES AND NUMBERS, THEY SENT A NOTICE OF REJECTION TO MR. LONG ON 11-7-98, CONCERNING THE PUBLICATION I OR-DERED. MR. LONG HAD ORDERED SOME ADULT MAGAZINES THAT HAD ALSO BEEN REJECTED. MR. LONG CAME TO ME, 11-7-98, AND ASKED MY ADVICE IN REFERENCE TO THE REJECTED ADULT MAGAZINES, AND HE MENTIONED THE REJECTED PUBLICATION HE DID NOT ORDER.

V.    STATEMENT OF FACTS CONTINUED, (P-2):

(4) MR. LONG MENTIONED THAT THE PUBLICATION HE DID NOT ORDER WAS IN REFERENCE
TO MARIJUANA. I THEN ASKED MR. LONG TO LET ME SEE THE REJECTION SLIP HE RECEIVED?
HOWEVER, I NEVER INFORMED MR. LONG THAT I HAD ORDERED SUCH MATERIAL MYSELF. AFTER
VIEWING THE NAMES OF THE BOOKS, I FELT THEY WERE THE BOOKS I ORDERED, SO I ADVISED
MR. LONG TO TAKE THE REJECTION NOTICE BACK TO THE MAIL ROOM THE FOLLOWING DAY, 10-8-
98, AND EXPLAIN THAT HE NEVER ORDERED SUCH MATERIAL.

(5) MR. LONG RETURNED THE REJECTION NOTICE TO THE MAILROOM ON 10-8-98, AND WAS
INFORMED BY MS. TERRI BASFORD, OF THE RECORDS DEPARTMENT, AND MS. MICHELLE CLOWER,
OF INMATE SYSTEMS MANAGEMENT, THAT THEY MADE A MISTAKE BECAUSE THE REJECTION NOTICE
SHOULD HAVE BEEN SENT TO INMATE ROBERT WILLIAMS, OF CREEK-A UNIT INSTEAD OF HIMSELF.
THIS INFORMATION GIVEN TO MR. LONG IS AN OUTRIGHT VIOLATION OF BUREAU POLICY, AND A
VIOLATION OF MY RIGHTS TO PRIVACY CONCERNING MY MAIL AND INCOMING PUBLICATION, ALSO,
A VIOLATION OF U.S. POSTAL LAWS.

(6) ALTHOUGH MR. LONG RETURNED THE ERRONEOUS REJECTION NOTICE TO THE MAILROOM
ON 10-8-98, I WAS NOT SENT A REJECTION NOTICE UNTIL 10-28-98. (SEE EXHIBIT-C) THE
ASSOCIATE WARDEN, MR. W.S. WILLINGHAM, SENT ME THE REJECTION NOTICE, ACTING FOR THE
WARDEN. (SEE EXHIBIT-D) THIS PROGRAM STATEMENT WAS NOT ADHERED TO IN THE ERRONEOUS
REJECTION OF MY PUBLICATION. ON PAGE-2, §540.71(a) STATES THAT ONLY THE WARDEN MAY
REJECT AN INCOMING PUBLICATION, AND MR. WILLINGHAM IS CERTAINLY NOT THE WARDEN. ALSO,
ON LINE (b) MY PUBLICATION WAS REJECTED BECAUSE IT'S CONTENT IS UNPOPULAR OR REPUGNANT.
ON PAGE-3(b-3 & 6) MY PURPOSE OR INTENT WAS NOT TO MANUFACTURE DRUGS, OR FOR THE INSTRUC-
TION IN THE COMMISSION OF CRIMINAL ACTIVITY. THERE IS NO POSSIBLE WAY THAT I COULD GROW
MARIJUANA WHILE INCARCERATED WITHOUT BEING CAUGHT. MY SOLE PURPOSE IS TO OBTAIN THE
KNOWLEDGE ABOUT GROWTH AND THE LEAST EXPENSIVE ABILITY TO OBTAIN MARIJUANA IF PRESCRIBED
FOR MEDICAL PURPOSES UPON MY RELEASE, WHILE I'M STILL ABLE TO SEE GOOD ENOUGH TO READ.
MY EYESIGHT IS DIMINISHING RAPIDLY.

(7) ON PAGE-4(c) THE WARDEN OR MR. WILLINGHAM NEVER REVIEWED THE INDIVIDUAL PUBLI-
CATION PRIOR TO THE REJECTION OF THAT PUBLICATION. (d) I WAS NEVER GIVEN AN OPPORTUNITY
TO REVIEW MY PUBLICATION BY THE WARDEN OR THE REGIONAL EDUCATION OR LEGAL STAFF. (e)THE
PUBLISHING COMPANY WAS NEVER NOTIFIED OF THE REJECTION AS SHOULD HAVE BEEN, SO THEREFORE,
I'M BEING DENIED MY PUBLICATION AND HAVE SUFFERED THE LOSS OF MY MONEY.

I CERTAINLY UNDERSTAND THAT MARIJUANA IS AN ILLEGAL DRUG, BUT THE PUBLICATION I
ORDERED IS NOT ILLEGAL, AND I DID NOT ORDER ANY SEEDS OR ANYTHING ELSE PERTAINING TO
THE DRUG. NEITHER IS THE PUBLISHING COMPANY ILLEGAL OR AN UNDERGROUND COMPANY. IN CER-
TAIN STATES, AS IS CALIFORNIA, IF A MEDICAL DOCTOR PRESCRIBES MARIJUANA TREATMENT, YOU
ARE ALLOWED TO GROW A LIMITED AMOUNT FOR PERSONAL MEDICAL USE FOR YOUR TREATMENT. AND
IT'S CHEAPER TO GROW YOUR OWN PERSONAL USE. FURTHERMORE, THE BUREAU OF PRISONS IS ABUS-
ING THEIR AUTHORITY AND VIOLATING MY RIGHTS UNDER THE DISGUISE OF BEING DETRIMENTAL TO
THE GOOD ORDER OR DISCIPLINE OF THE INSTITUTION.

V.  STATEMENT OF FACTS CONTINUED, (P-3)

(8) THE DAMAGE TO THE PETITIONER IS IRREPARABLE TO THE EXTENT THAT NOT ONLY AM
I BEING DENIED MY PUBLICATION, I AM ALSO SUFFERING FROM THE LOST OF MY FUNDS, DUE
TO THE FACT THAT WHEN MY PUBLICATION WAS REJECTED IN OCTOBER 2, 1998, THE WARDEN
FAILED TO ADHERE TO THE BUREAU OF PRISONS POLICY, PROGRAM STATEMENT 5266.08, §540.71,
(e) WHICH STAtES: THE WARDEN SHALL PROVIDE THE PUBLISHER OR SENDER OF AN UNACCEPTABLE
PUBLICATION A COPY OF THE REJECTION LETTER. THE WARDEN SHALL ADVISE THE PUBLISHER OR
SENDER THAT HE MAY OBTAIN AN INDEPENDENT REVIEW OF THE REJECTION BY WRITING TO THE
REGIONAL DIRECTOR WITHIN 20 DAYS OF RECEIPT OF THE REJECTION LETTER. (SEE LAST PAGE
OF EXHIBIT-C) FURTHER, THE PUBLISHER MUST BE ALLOWED TO PROTEST THE REFUSAL AND THE
COMPLAINT MUST BE DECIDED BY AN OFFICIAL OTHER THAN THE ONE WHO MADE THE ORIGINAL
DECISION TO REFUSE THE DELIVERY.

(9) THE BOP REGULATION USED TO WITHOLD MY PUBLICATION IS VOID FOR VAGUENESS AND
OVERBREADTH. THERE IS NO VALID, RATIONAL CONNECTION BETWEEN THE REGULATION AND A LE-
GITIMATE AND NEUTRAL GOVERNMENT INTEREST PUT FORWARD TO JUSTIFY IT, WHICH CONNECTION
CANNOT BE SO REMOTE AS TO RENDER THE REGULATION ARBITRARY OR IRRATIONAL. IN FACT, THE
REGULATION REPRESENTS AN EXAGGERATED RESPONSE TO PRISON CONCERNS.

(10) MY ATTEMPT AT AN INFORMAL RESOLUTION WAS DENIED WITHOUT ANY ATTEMPT WHATSOEVER
TO RESOLVE THE ISSUE. ALSO, NEITHER THE COUNSELOR OR THE UNIT MANAGER REVIEW MY PUBLI-
CATION AS IS POLICY, BEFORE DENYING MY APPEAL. (BP-8 1/2).... MY ATTEMPT FOR ADMINISTRA-
TIVE REMEDY, (BP-9) WAS DENIED BY THE WARDEN AND NEITHER DID HE REVIEW MY PUBLICATION
AS REQUIRED..... MY BP-10, REGIONAL APPEAL RESPONSE DID NOT ADHERE TO THE TIME LIMI-
TATIONS. IN FACT, THEIR RESPONSE DUE DATE WAS JANUARY 19, 1999. HOWEVER, IT'S THE BUREAU
OF PRISONS POLICY THAT IF A RESPONSE IS NOT ON TIME AND THERE WAS NO EXTENSION REQUESTED,
THE INMATE CAN ACCEPT THAT AS A DENIAL ON THAT LEVEL. THEREFORE, ON JANUARY 24, 1999, I
FILED A BP-11, APPEAL TO THE CENTRAL OFFICE. NOTICE ON THIS APPEAL, I BEGAN THE FIRST
SENTENCE EXPLAINING THAT THE REGIONAL OFFICE NEVER RESPONDED TO MY APPEAL BY JAN. 19,
1999, AND NEITHER DID THEY REQUEST ANY EXTENSION. NEVERTHELESS, THE CENTRAL OFFICE
IGNORED THESE FACTS AND ERRONEOUSLY REJECTED MY APPEAL BECAUSE I DID NOT ENCLOSE A
COPY OF THE REGIONAL OFFICE APPEAL AND RESPONSE. IRONICALLY, IGNORING MY EXPLANATION
THAT THE REGIONAL OFFICE FAILED TO RESPOND TO MY APPEAL. FINALLY, ALTHOUGH IRRELEVANT
AT THAT TIME BECAUSE OF THE TIME LIMITATION DEFAULT, THE REGIONAL OFFICE SENT THEIR
RESPONSE AFTER I FILED MY BP-11 TO THE NEXT LEVEL, AS WAS MY RIGHTS. HOWEVER, NOTICE
THEY SIGNED THEIR REPONSE DATE AS JANUARY 20, 1999. notice ON THE BOTTOM RIGHT HAND
CORNER, THE CASE MANAGER VERIFIED THAT I DID NOT RECEIVE THIS RESPONSE UNTIL JANUARY
27, 1999. nevertheless, JANUARY 20, 1999, WAS STILL PAST THEIR RESPONSE DUE DATE.

ALSO, I ASKED MY UNIT MANAGER FOR THE FIRST NAME OF DEFENDANT, WILLINGHAM, AND
MR. HARRIS, MICHAEL, INFORMED ME THAT THE OFFICIAL NAME HE GOES BY IS W.S. WILLINGHAM!

## VI.   STATEMENT OF CLAIM:

State as briefly as possible what rights under the Constitution, laws, or treaties of the United States you claim have been violated.  Be specific.  Number each separate claim, and relate each claim to the facts in the complaint.  If the claims are not related to the same basic incident or issue, they must be addressed in a separate civil rights complaint.

(1) MY CLAIM INVOLVES A CHALLENGE TO THE FIRST AMENDMENT OF THE CONSTITUTION.

I AM CHALLENGING THE BUREAU OF PRISONS POLICY §541.71, THAT ALLOWS THE WARDEN

TO VIOLATE THE FIRST AMENDMENT OF THE CONSTITUTION. THIS ACTION BY THE WARDEN

IS AN ABUSE OF POWER. MY FIRST AMENDMENT RIGHT TO RECEIVE PUBLICATION THAT AD-

DRESSES MY SERIOUS MEDICAL NEEDS ARE BEING VIOLATED.

(2) MY CLAIM ALSO INVOLVES A FIFTH AND EIGTH AMENDMENT VIOLATION TO DUE PROCESS.

THE WARDEN HAS BASED HIS DECISION TO VIOLATE MY FIRST AMENDMENT RIGHT ON AN

ERRONEOUS FACTUAL FINDING. HIS FINDING TO VIOLATE MY FIRST AMENDMENT RIGHT IS

THAT THE PUBLICATION INFRINGES ON THE SECURITY OF THE INSTITUTION.

## VII. RELIEF REQUESTED:

State briefly what relief you seek from this court.  Do not make
any legal arguments or cite any cases.  You may, if you wish, cite
statutes which authorize the relief requested, but need not do so.

TO DEEM BOP POLICY §541.71, IN VIOLATION OF THE FIRST AMENDMENT. TO DIRECT

THE BOP TO ALLOW THE PETITIONER TO RECEIVE HIS PUBLICATION. TO GRANT COMPENSA

TORY DAMAGES IN THE AMOUNT OF $1000.00, AND PUNITIVE DAMAGES IN THE AMOUNT OF

$5000.00.

TO GRANT ANY ADDITIONAL EQUITABLE RELIEF THIS COURT DEEMS FIT AND PROPER

UNDER THE CIRCUMSTANCES OF THIS CASE, INCLUDING ATTORNEY FEES IF NEED BE!

## VIII.   I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS OF FACT, INCLUDING ALL CONTINUATION PAGES, ARE TRUE AND CORRECT.

Signed this ___27th___ day of ___August___, 19_99_.

_Robert Williams_

(Signature(s) of Plaintiff(s))

EXHIBIT A

Exhibit #A

# Proposition 215 and You

## A Guide for Medical Marijuana Patients — Updated May 15, 1997

Proposition 215 created a new exemption from state criminal penalties for medical use of marijuana (codified as California Health and Safety Code Section 11362.5). A recent federal court ruling protects doctors who recommend marijuana for most medical purposes. This brochure gives a general description of how the exemption applies to Californians. It represents the best of our knowledge as of the date printed above. Be sure to speak with a lawyer for an up-to-date interpretation and answers to any specific questions about your own situation.

Prop. 215 did not legalize marijuana. It changed how certain people — doctors, medical patients and their "primary caregivers" — will be treated by the State of California's court system. Patients with a doctor's recommendation to use marijuana in medical treatment have a new legal defense available to them. Physicians are exempt from state-level penalties for recommending marijuana, and in most cases they are protected from federal sanctions as well, for the time being.

If arrested by state or local authorities on marijuana charges, patients can claim immunity under state law. The burden of proof is largely on the patient to prove his or her medical need, and to prove that marijuana was used with the recommendation of a doctor. Because compliance is so important, take time to understand the new law. And remember, federal laws banning medical marijuana remain in effect — while federal charges are rarely brought for small-scale, personal possession or cultivation of marijuana, the protections of Prop. 215 do not fully immunize you from any punishment.

## Who is affected by Prop. 215?

Proposition 215 was designed to protect seriously and terminally ill patients from state-level criminal penalties for using marijuana medically. Only people with their doctor's recommendation to use marijuana in medical treatment can take advantage of Prop. 215 as a legal defense against marijuana charges.

A doctor must judge whether marijuana is appropriate for treatment of a specific illness. Simply having a specific disease does not automatically qualify anyone for the marijuana exemption under Prop. 215. Only a doctor's recommendation can do that.

## What is medical marijuana used for          ?

Marijuana has been used for centuries by doctors and patients all over the world. Some conditions for which patients report medical benefits from marijuana:

• **Nausea reduction.** The most common medical application of marijuana is for the reduction of nausea — the extreme nausea caused by cancer chemotherapy and AIDS treatment, and even common nausea induced by standard medications for various ailments. Patients facing such treatments often find that just a small amount of inhaled marijuana can immediately quell nausea.

• **Increasing appetite.** Marijuana also reportedly increases appetite for patients with nausea or other conditions, permitting more normal food intake and preventing dangerous weight loss. This is particularly important to patients with AIDS "wasting syndrome."

• **Reducing eye pressure in glaucoma patients.** Glaucoma is a progressive disease of the eye which can lead to blindness. It results from a buildup of pressure within the eye. Marijuana reduces the pressure within the eye, holding off some of the damage.

• **Controlling muscle spasms,** seizures and **chronic pain.** Marijuana is also used medically by patients with **epilepsy, paralysis, arthritis, multiple sclerosis, spinal cord injuries** and **migraines.**

## Can I get a prescription for marijuana?

**No.** Even though Prop. 215 is now law, it is still not possible to get a standard prescription for marijuana from a doctor. Pharmacies cannot carry marijuana, because it is still illegal under federal law for use as a medicine.

Instead, Prop. 215 permits doctors to make "recommendations" for medical marijuana use, or to "approve" such use, either in writing or verbally. Never should a marijuana recommendation be made lightly. If you are arrested and charged with a marijuana offense, the doctor may be required to testify on your behalf. For this reason, the doctor needs to be clear about the rationale for the recommendation, and should monitor the patient's progress carefully. It is best to be conservative and cautious in obtaining the recommendation and in trying to keep it valid.

## Can a doctor's recommendation expire?

**Yes.** For as long as the marijuana-recommending physician is in charge of the patient's care, and for as long as the physician continues to believe marijuana is helpful, the patient is protected under California law from criminal penalties for marijuana. However, if a patient changes doctors, or if the recommending doctor changes his or her opinion of marijuana's importance to treatment, the patient may not be protected any longer. Common sense suggests that the recommendation must be current to be valid when used as a legal defense, and therefore should be periodically renewed.

## Federal laws against marijuana — what you need to know about your doctor's legal risks.

After Prop. 215 passed, federal officials threatened California physicians who recommend marijuana under Prop. 215 with revocation of their federally issued license to prescribe drugs, cutoff from eligibility for the Medicare and Medicaid programs, and even criminal prosecution. Doctors quickly became aware of these threats, and, out of fear, many of them have become very reluctant to discuss medical marijuana at all. However, a lawsuit filed against the federal government by several California physicians and some patients and organizations has succeeded in eliminating most of the risk for physicians who recommend medical marijuana.

On April 30, 1997, federal Judge Fern Smith issued a **preliminary injunction** in the case, titled *Conant vs. McCaffrey*, preventing the threatened punishments while the case proceeds to trial. This general protection for physicians could therefore remain in effect for one or two years, unless the judge's action is overturned by a higher court. Even in the unlikely event that it is overturned, doctors who recommend marijuana in the interval are protected from future action against them.

Judge Smith's injunction has a couple of important qualifiers: **1) The protection from federal penalties applies only to physicians treating patients with cancer, glaucoma, HIV and AIDS, and/or "seizures or muscle spasms associated with a chronic, debilitating condition"**; and 2) The protection has a limit — doctors may not get involved directly in helping a patient to acquire marijuana. Judge Smith defined this limit as "criminal conduct" under federal law, meaning "aiding and abetting or conspiracy" to violate federal drug laws.

This second qualification will not be clear to some physicians. Constantly updated guidelines for physicians are produced by the California Medical Association, and are available by calling (800) 592-4CMA. In addition, the provisions above could change, perhaps expanding the reach of the protections, since litigation in the case is ongoing.

## How to document a medical marijuana recommendation or approval from your doctor.

Federal officials have stated clearly that physicians and patients have the right to freely discuss the risks and benefits of medical marijuana. Judge Smith's April 30 ruling went a step further, permitting doctors treating the conditions listed above to affirmatively recommend marijuana to their patients, as called for under Prop. 215. However, Judge Smith said physicians cannot directly assist patients with obtaining marijuana.

It is best if you obey some limits in your discussion with your doctor. In simplest terms: talk about your condition, talk

about medical marijuana, but don't talk about how or where you might obtain it.

If, for instance, you were to say to your physician, "Please write me a recommendation so that I can begin to grow marijuana," you would be giving unnecessary detail that would make your physician aware that the recommendation would lead to activity considered to be criminal under federal law (even though it is legal under state law). Your doctor could then possibly be punished for knowingly helping you to obtain marijuana.

**What you need most from your doctor is a professional medical opinion as to the possible usefulness of medical marijuana in your treatment.** Ask your physician to discuss the risks and benefits of medical marijuana for your particular case. Whether or not your doctor believes it might help, good medical practice requires your physician to record the fact that you have had the conversation in your medical records. If the doctor recommends marijuana, that ought to go into the record.

State law permits you access to copies of your medical records. Patients request copies of their medical records all the time, for a variety of reasons. Whether you request copies of your records to be protected under Prop. 215, or merely to keep in a private file at home, should be of no real concern to your doctor or anyone else. Just remember, when you request copies of your medical records from your doctor's office, not to unnecessarily mention anything about your possible intention to obtain or grow marijuana. You should ask for the entire chart or record, not just sections pertaining to marijuana.

This copy of your medical records, indicating that you have a medical marijuana recommendation, will be the basis for your protection under Prop. 215. Make copies and keep at least one in a secure place; try to have one with you or with any marijuana you might come to possess later on.

Because of the risks your doctor faces if he or she helps you obtain marijuana, you should not ask your doctor to suggest a place or person from whom to obtain marijuana — obtaining it is your responsibility alone.

## How can patients buy marijuana?

Most patients still have to rely on the black market for marijuana. Selling marijuana remains illegal, but a patient who possesses marijuana upon a doctor's recommendation is protected from state-level criminal penalties for possession under state law. "Cannabis buyers' clubs" may be an option for some (see below). If the operators are satisfied that a person has a true medical need, they will register the patient and permit that person to buy marijuana.

## How to join a cannabis buyers' club without putting your doctor at risk.

Cannabis buyers' clubs have existed in various parts of California for the last several years, and more are opening in the wake of Prop. 215's passage. These facilities sell medical

marijuana to patients after a careful screening process verifies a person's medical condition, and after attempts are made to verify that the patient has a doctor's recommendation.

All cannabis buyers' clubs are illegal under federal law, though many facilities, as a result of their developing trusting relationships with local authorities, are tolerated and even regulated by communities. If local officials, including police, believe that the facilities only distribute marijuana to truly sick people, they may permit them to operate on a modest scale.

Unfortunately, because of the federal threats against physicians and the exceptions made in Judge Smith's order, doctors are still likely to be wary of dealing directly with a buyers' club. The California Medical Association still advises its doctors to be very cautious and not to fill out forms with a buyers' club logo or with the intent of transferring the information to such a club. By approaching this process carefully, however, you can very likely join a buyers' club without putting your doctor at risk.

First, follow the steps detailed above for documenting your marijuana recommendation. Next, call the club closest to you and tell them what documentation you already have, and ask if it is enough to begin your membership process. If so, bring the documents to the club and follow the staff's advice on how to proceed.

You should know that, for their own protection, the clubs need two things: proof of your illness, and the best documentation they can get that your doctor approves of your medical use of marijuana. The intake staff at the clubs will try to work with you in a way that brings you into the club and does not expose anyone to unnecessary legal danger or repercussions.

## Can I grow marijuana?

• **Yes**. Under Prop. 215, the cultivation of marijuana plants for the personal, medical use of a patient is permitted. However, you must go to the black market for seeds or seedlings.

Cultivation of marijuana remains a felony under federal law. A person arrested and charged with cultivation under state law has the right to use a Prop. 215 defense, if the cultivation was for personal use only, and if the patient has a doctor's recommendation. Federal agents are believed to be unlikely to arrest and prosecute small-time growers of marijuana for medical use, because small-scale cases are not a high priority to federal law enforcement. Still, prosecutions by federal agencies are possible.

• **Cultivation guidelines**. It is important to keep any cultivation within the boundaries suggested by Prop. 215.

Grow no more marijuana than you need for personal consumption. There is no concrete standard for numbers of plants under Prop. 215. Generally speaking, one to a few healthy plants should satisfy a patient's needs. Attorney General Dan Lungren has taken the position that "one marijuana plant produces approximately one pound of bulk marijuana ... Therefore, one can argue that more than two plants would be cultivation of more than necessary for personal medical use.... [But] the number of plants will depend on the circumstances."

**Do not give away, distribute or sell marijuana under any circumstances to anyone.** Any evidence of such distribution puts a person at very high risk. A Prop. 215 defense will not work for someone who distributes or sells any amount of marijuana, because the new law applies only to a patient's personal, medical supply. If prosecutors discover evidence of sale or distribution, they can charge a person with felony counts that could result in years of prison time, regardless of that person's medical condition or medical authorization to use marijuana.

• **Cultivation co-operative farms.** According to Attorney General Dan Lungren, it may be possible for a group of patients and/or their caregivers to join together to create a small plot of marijuana plants strictly for the patients' use. In a February 24, 1997, letter to California law enforcement officers (No. 97-BNE-01), Lungren wrote: "a true cooperative cultivation of a very small number of plants by properly qualified patients and/or caregivers might qualify for the [Prop. 215] affirmative defense." Exercise caution and speak with attorneys before assuming that a co-op is legal.

## If I'm caught, how does 215 protect me?

If you are caught with marijuana you are using with a doctor's authorization, you will have a few opportunities to prove that you are a legal, medical user of the drug. Though Prop. 215 does not specifically prevent arrests, police officers are now being trained in ways to determine legitimate medical use versus illegal, social use, when they discover a person with marijuana. You can make a police officer's job easier, and protect yourself, by carrying written documentation of your medical need for marijuana, including a copy of your doctor's recommendation or medical records.

If a police officer has any reason to doubt that a patient is using marijuana — or cultivating it — for only personal, medical use, the officer is free to make an arrest. On November 6, 1996, the Attorney General issued broad guidelines for officers to help determine who has a legitimate medical-use claim under Prop. 215. These guidelines can also be helpful to patients. In part, officers are told to ask about or investigate:

• the person's status as patient or caregiver, and the documented medical condition of the patient in question;

• the name of the physician who recommended marijuana;

• quantity and packaging of the marijuana; and

• the presence of pay/owe documents, weapons, police radio scanners, or other evidence of conduct associated with drug dealing.

Most legitimate cases of patients and specified caregivers facing charges for strictly medical use of marijuana are likely

to be dismissed before proceeding to trial. Local police investigators or prosecutors ought to be able to determine, from evidence presented by arrested persons, who is and who is not entitled to an exemption from the marijuana laws under Prop. 215. Some cases may go to trial, in which case the patient and physician involved should expect to testify under oath about the reasons for the patient's medical marijuana use. If your physician is unwilling to testify, you should point to Judge Smith's April 30 injunction and the CMA's guidelines, both of which say it is clearly permissible for doctors to testify about their recommendations. If your doctor remains hesitant, your lawyer can issue a subpoena to the doctor, adding to the protection your physician should feel in coming to court.

Patients should be allowed to assert a Prop. 215 defense, and the evidence for it, at a pre-trial hearing, rather than awaiting a full trial. (The state attorney general has pointed out that Penal Code section 866(a) permits presentation of such a defense at a preliminary hearing, while section 1020 preserves the right to present the defense at trial.) If you are caught, your defense attorney should try to work out the earliest possible opportunity to present elements of your medical defense, to avoid unnecessary expense and time for everyone involved.

### Who qualifies as a "primary caregiver?"

Prop. 215 was designed to protect patients from prosecution for medical use of marijuana. However, the new law recognizes that some patients may be in such ill health that a family member or close friend may need to obtain and possess marijuana for that patient. Or, a patient may live with someone who could be subject to criminal or civil charges for the patient's marijuana kept on the same property. In this spirit, so-called "primary caregivers" to medical marijuana patients are also exempted from marijuana charges.

So who is a "primary caregiver?" The Prop. 215 text defines such a person as **"the individual designated by the … [patient] who has consistently assumed responsibility for the housing, health or safety of that person."** The fact that a person must have "consistently assumed responsibility" for the patient's welfare could narrow the definition of "primary caregiver" considerably. Family members, very close friends and roommates of patients will fit this definition most readily.

The best advice at this time is to be conservative in designating a caregiver or in considering yourself to fit under the new law's definition. A judge may have to decide each case on its merits.

### Is there a pill form of marijuana?

There is a pill form of one of the many chemicals found in marijuana, tetrahydracannabinol (THC). It is available by prescription under the trade name Marinol. Marinol's use is currently restricted to cancer and AIDS patients; so-called "off-label" prescription of Marinol for other conditions may lead to punitive action by federal authorities.

For some people, Marinol works fine, at least for a while. But for many patients, it is too expensive — costing up to $30,000 a year — or too powerful. And taking a pill to combat nausea is often impractical. Some patients say that Marinol takes too long to work and then "knocks them out," as opposed to marijuana in its whole form, which permits dosage to be better controlled and has milder effects. Researchers are now investigating ways to vaporize THC or marijuana to bring maximum benefits without smoking.

### Banned activities for medical marijuana patients and caregivers.

Prop. 215 does not give a broad freedom to medical marijuana patients to use marijuana anywhere, any time.

Prop. 215 contains a provision ensuring that "conduct that endangers others" remains illegal. Such conduct is likely to include driving under the influence of marijuana, operating heavy machinery, or other similar activities, in which there is a realistic risk that a person's marijuana use could impair judgment and lead to harm to other people.

Courts would probably also consider smoking marijuana in public or in the workplace to be a danger to others, permitting sanctions against anyone for doing so.

Drug testing programs — including urinalysis and hair testing — required by federal agencies and some businesses for workers in certain safety-sensitive positions are unaffected by Prop. 215. Even where drug testing is not a factor, employers may prevent employees from using marijuana on the job, if any degree of impairment would interfere with their work — for example, factory workers who must operate complex or heavy machinery.

### A warning to all marijuana users.

Prop. 215 was designed to protect a specific class of people — the seriously and terminally ill. It does not apply to recreational users of marijuana who simply feel they get some "medical" benefit. It does not even apply to terminally ill patients who fail to get their physicians' approval. Prop. 215 enables the courts to sort out who is entitled to these new protections, and who is not.

Every detail, from proof of illness to the form and reasons for a marijuana recommendation, is a potential weak link in a person's case. Don't put yourself at risk on a flimsy claim of a medical need for marijuana!

AMERICANS FOR MEDICAL RIGHTS • SPONSORS OF PROPOSITION 215
626 SANTA MONICA BLVD., SUITE 41 • SANTA MONICA, CA 90401 • 1-888-YES-4-215
This service was made possible by a grant from the Drug Policy Foundation (Washington, D.C., and New York).

Exhibit #B



# UNITED STATES GOVERNMENT MEMORANDUM

**FEDERAL CORRECTIONAL INSTITUTION**
3625 FCI Road
Marianna, Florida 32446


October 2, 1998

From:        Keith E. Hall, Warden

Subject:     Rejected Publication

To:          William Long, Register Number 09036-002


Eight publications entitled "Marijuana Hydroponics, Supermother's Cooking With Grass, Growing Extraordinary Marijuana, A Guide to Cannabis Under Fluorescents, Dr. Atomic's Marijuana Multiplier, The Marijuana Consumer's and Dealer's Guide, Super Grass Grower's Guide, and The Pot Book" were received at this institution addressed to you. In accordance with Bureau of Prisons Program Statement 5266.08 "Incoming Publications", the warden may reject material sent to an inmate if it is detrimental to the security, good order, or discipline of the institution. I have determined that these publications will not be delivered to you.

Specifically, the entire publications detail how to grow marijuana which is an illegal drug. I have determined that these publications would be detrimental to the good order and security of this institution.

You may appeal this decision by administrative remedy, which must be filed within twenty days of receipt of this memorandum. If you wish to review the rejected material, you may contact the institution mail room.

 

**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CPD
**NUMBER:** 5266.08
**DATE:** August 20, 1997
**SUBJECT:** Incoming Publications

**EFFECTIVE DATE:** August 20, 1997

1. [<u>PURPOSE AND SCOPE</u> §540.70. The Bureau of Prisons permits an inmate to subscribe to or to receive publications without prior approval and has established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity. The term publication, as used in this subpart, means a book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, plus such other materials addressed to a specific inmate such as advertising brochures, flyers, and catalogs.]

2. <u>PROGRAM OBJECTIVES</u>. The expected results of this program are:

   a. Inmates will be permitted to receive and retain publications as specified.

   b. Publications that are detrimental to the security, good order, or discipline of the institution or that may facilitate criminal activity will be excluded.

3. <u>DIRECTIVES AFFECTED</u>

   a. <u>Directive Rescinded</u>

   PS 5266.07    Incoming Publications (12/1/96)

   b. <u>Directives Referenced</u>

   PS 1001.12    Donations, Acceptance of (7/1/96)
   PS 1330.13    Administrative Remedy Program (12/22/95)
   PS 5265.09    Correspondence (1/17/96)
   PS 5360.06    Religious Beliefs and Practices of Committed
                 Offenders (8/29/95)

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

PS 5266.08
August 20, 1997
Page 2

        PS 5580.05    Personal Property, Inmate (9/30/96)
        PS 5800.10    Mail Management Manual (11/3/95)

   c.  Rules cited in this Program Statement are contained in 28
CFR 540.70 and 540.71.

4.  STANDARDS REFERENCED

   a.  American Correctional Association 2nd Edition Standards for
Administration of Correctional Agencies:  2-CO-5D-01.

   b.  American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions:  3-4432.

   c.  American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities:  3-ALDF-5D-04.

5.  [PROCEDURES §540.71

   a.  An inmate may receive hardcover publications and newspapers
only from the publisher, from a book club, or from a bookstore.
An inmate may receive other softcover material (for example,
paperback books, newspaper clippings, or magazines) from any
source.  The Warden may have all incoming publications inspected
for contraband.  The Warden may designate staff to review and
where appropriate to approve all incoming publications in
accordance with the provisions of this subpart.  Only the Warden
may reject an incoming publication.]

   The rejection is by the Warden or, in the Warden's absence, by
the Acting Warden.

   It is recommended that an inmate who wishes to order a
publication first speak with a designated staff member to
ascertain whether individual issues of the publication are likely
to be approved.  This discussion is not required, but it may
avoid disappointments and bookkeeping problems when a publication
is later determined to be unacceptable.

   [b.  The Warden may reject a publication only if it is
determined detrimental to the security, good order, or discipline
of the institution or if it might facilitate criminal activity.
The Warden may not reject a publication solely because its
content is religious, philosophical, political, social or sexual,
or because its content is unpopular or repugnant.  Publications
which may be rejected by a Warden include but are not limited to
publications which meet one of the following criteria:

      (1)  It depicts or describes procedures for the construction
or use of weapons, ammunition, bombs or incendiary devices;

PS 5266.08
August 20, 1997
Page 3

(2)   It depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;

(3)   It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs;

(4)   It is written in code;

(5)   It depicts, describes or encourages activities which may lead to the use of physical violence or group disruption;

(6)   It encourages or instructs in the commission of criminal activity;

(7)   It is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.]

While publications may not be excluded under Section 5 b.(7) solely because they have sexual content, some sexually oriented publications may be rejected.  In order to assist staff in determining which materials may pose the type of threat which warrants exclusion, the following guidelines are given.

(a)   A Warden may determine that sexually explicit material of the following types is to be excluded, as potentially detrimental to the security and good order, or discipline of the institution, or as facilitating criminal activity:

     (i)   Sado-masochistic
     (ii)  Bestiality
     (iii) Involving children

(b)   Additionally:

(i)   The Warden shall prohibit a sexually explicit publication if it is determined to pose a threat to the institution.  Child-model materials, which are prohibited by law, must be prohibited.

(ii)  Sexually explicit material does not include material of a news or information type.  Publications concerning research or opinions on sexual, health, or reproductive issues, or covering the activities of gay rights organizations or gay religious groups, for example, should be admitted.

(iii) Literary publications should not be excluded, solely because of homosexual themes or references, if they are not sexually explicit.

(iv) Sexually explicit material may nonetheless be
admitted if it has scholarly value, or general social
or literary value.

[c.  The Warden may not establish an excluded list of
publications.  This means the Warden shall review the individual
publication prior to the rejection of that publication.
Rejection of several issues of a subscription publication is not
sufficient reason to reject the subscription publication in its
entirety.

d.  Where a publication is found unacceptable, the Warden shall
promptly advise the inmate in writing of the decision and the
reasons for it.  The notice must contain reference to the
specific article(s) or material(s) considered objectionable.  The
Warden shall permit the inmate an opportunity to review this
material for purposes of filing an appeal under the
Administrative Remedy Program unless such review may provide the
inmate with information of a nature which is deemed to pose a
threat or detriment to the security, good order or discipline of
the institution or to encourage or instruct in criminal
activity.]

¹ In questionable cases, institution staff may consult with the
regional education or legal staff.

[e.  The Warden shall provide the publisher or sender of an
unacceptable publication a copy of the rejection letter.  The
Warden shall advise the publisher or sender that he may obtain an
independent review of the rejection by writing to the Regional
Director within 20 days of receipt of the rejection letter.  The
Warden shall return the rejected publication to the publisher or
sender of the material unless the inmate indicates an intent to
file an appeal under the Administrative Remedy Program, in which
case the Warden shall retain the rejected material at the
institution for review.  In case of appeal, if the rejection is
sustained, the rejected publication shall be returned when appeal
or legal use is completed.]

See Notification to Inmate and Publisher/Sender of **Rejected**
Publication (Attachment A) for a sample notification to inmate
and publisher/sender.

The Warden shall retain the rejected publication for 20 days
from the date that the inmate is sent written notification of the
rejection.  This 20-day period is to allow the inmate the
opportunity to file an appeal under the Administrative Remedy
Program.

PS 5266.08
August 20, 1997
Page 5

    If the inmate does not file an appeal within 20 days, the
rejected publication may be returned to the publisher.  If the
inmate does file an appeal, the Warden shall retain the rejected
publication at the institution.  The rejected publication or the
offensive portion of it must be reviewed prior to a staff
response being prepared for the BP-9 or, when applicable, for a
BP-10 and/or BP-11.

    The Regional Office and Central Office should not respond to a
BP-10 or BP-11 appeal of a rejected publication without first
reviewing either the rejected publication or a copy of the
offensive portion of it.

    **[f. The Warden may set limits locally (for fire, sanitation or
housekeeping reasons) on the number or volume of publications an
inmate may receive or retain in his quarters.  The Warden may
authorize an inmate additional storage space for storage of legal
materials in accordance with the Bureau of Prisons procedures on
personal property of inmates.]**


                              \s\
                              Kathleen M. Hawk
                              Director

PS 5266.08
August 20, 1997
Attachment A

NOTIFICATION TO INMATE AND PUBLISHER/SENDER OF **REJECTED**
PUBLICATION (TO BE USED WHEN REJECTING A PUBLICATION UNDER
SECTION 5 OF THIS PROGRAM STATEMENT)


DATE: _____


Inmate: _____

Register Number: _____

Institution: _____


RE: _____ Issue: _____


The above named publication/material from [publisher/sender name]
has been rejected in accordance with the Bureau's Program
Statement on Incoming Publications (PS 5266.08), which provides
in part:

> ░The Warden may reject a publication if it is determined
> detrimental to the security, good order, or discipline of
> the institution or if it may facilitate criminal activity.░

The above named publication has been rejected because [provide
reference to the specific article(s) or material(s) considered
objectionable and the reason(s) for the decision to reject].

A copy of this notification has been sent to the publisher/sender
who may obtain an independent review of this rejection by writing
to the Regional Director [name, address] within 20 days of
receipt of that copy.


_____
Warden

cc: [Publisher/Sender name and address]

*Exhibit #D*



## UNITED STATES GOVERNMENT MEMORANDUM

**FEDERAL CORRECTIONAL INSTITUTION**
3625 FCI Road
Marianna, Florida 32446

October 23, 1998

From:          Keith E. Hall, Warden

Subject:       Rejected Publication

To:            Robert Williams, Register Number 18433-018

Eight publications entitled "Marijuana Hydroponics, Supermother's Cooking With Grass, Growing Extraordinary Marijuana, A Guide to Cannabis Under Fluorescents, Dr. Atomic's Marijuana Multiplier, The Marijuana Consumer's and Dealer's Guide, Super Grass Grower's Guide, and The Pot Book" were received at this institution addressed to you. In accordance with Bureau of Prisons Program Statement 5266.08 "Incoming Publications", the warden may reject material sent to an inmate if it is detrimental to the security, good order, or discipline of the institution. I have determined that these publications will not be delivered to you.

Specifically, these publications detail how to grow marijuana which is an illegal drug. I have determined that these publications would be detrimental to the good order and security of this institution.

You may appeal this decision by administrative remedy, which must be filed within twenty days of receipt of this memorandum. If you wish to review the rejected material, you may contact the institution mail room.

*inmate Received on 10-28-98 4:40PM*

Administrative Remedies

MNA 1330.11B
June 1, 1994
Attachment A

ATTEMPT AT INFORMAL RESOLUTION
(Request for Administrative Remedy)

Federal Bureau of Prisons Program Statement 1330.11 Administrative Remedy
Procedures for Inmates, dated October 29, 1993, requires that inmates shall
informally present their complaint to staff and staff attempt to informally
resolve any issue before an inmate files a Request for Administrative Remedy
(BP-9).  If an informal resolution can not be met, the inmate will be given
a BP-DIR-09 form.

INMATE'S NAME: Robert Williams          REG. NO.: 18433-018      UNIT: Creek-A

1.   Nature of problem (cite relevant policy – if UDC/DHO appeal, specify
     relevant section of Inmate Discipline Policy): I am appealing the Warden's
     rejection of publication sent to me from Ronin Pulishing.  On October 28, 1998, I
     received a rejection notice dated Oct. 23, 1998.  (CONTINUATION ON BACK)

2.   State what action or resolution inmate expects.  Be Specific: I expect to
     retain and be given my publication until the outcome of this appeal in view of the
     violation of my First Amendment Right to receive publication that addresses my se-
     rious medical conditions, and treatments.

3.   (a) Summary of investigation:
     Checked with the Mail room staff in regards to this publication.

     (b) Summary of findings after investigation: You received a memorandum dated
     October 23, 1998, from Keith E. Hall, Warden stating the reasons for the rejection
     of your publications.  I have attached another copy of the memorandum, and the
     decision still stands.

4.   Indicate the action you have taken to resolve the matter informally
     (including actual steps taken to resolve):

5.   Explanation for non-resolution:

Date & Time Issued: 11/10/98   Correctional Counselor: C l/e
Date & Time Inmate Returned: 11/10/98   Correctional Counselor: ell

Date & Time Investigation Completed and BP-9 issued:

Unit Manager Signature: M Has  U. Mgr.

Distribution:   (1) If complaint is informally resolved, forward original,
                    signed below and dated by inmate, to Warden's Office for
                    filing.
                (2) If complaint is not informally resolved, forward original
                    (attached to BP-DIR-09 form) to Paralegal.

On _____ this issue was informally resolved.

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

# REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies  Additional instructions on reverse.*

From: Williams, Roberto          18433-018          Creek-A          F.C.I. Marianna
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST** I disagree with the rejection of my publication.  The use of Program Statement 5265.03, is an abuse of authority, as well as a violation of my Constitutional First Amendment Right, and also deprives me from obtaining medical knowledge about the best treatment available for certain medical conditions I suffer that marijuanna has proven to be the most effective form of treatment with the least side effects.  However, I'm not requesting any treatment of the item in any form, neither am I trying to order any seeds.  My only interest at this time is to gain medical information in concern of the least expensive way of receiving the medication, while I can see good enough to read.  My eye is diminishing by the day, in fact, the doctor preferred me to see the eye doctor in April, 1998.  And seven later I still haven't been seen. (Seven Months)  Perhaps it would be more appropriate for the Warden to correct that atrocious situation about the lenght of time it takes to see the eye doctor.  Furthermore, I am a Member of Americans For Medical Rights, and my receiving the books I ordered is certainly not detrimental to the good order and security of this institution.  How can it be?  It's marijuanna that's illegal, and I don't recall ordering the drug.  Furthermore, I don't even smoke marijuanna, however, I have a right to read the material I ordered, regardless if it's not of the Warden's taste. I seek to obtain my order until the outcome of appeal!

November 16, 1998
| DATE | | SIGNATURE OF REQUESTER |  *Robert Williams*

**Part B– RESPONSE**




| DATE | | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

THIRD COPY: RETURN TO INMATE                    CASE NUMBER: _____

                                              CASE NUMBER: _____

**Part C– RECEIPT**
Return to: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

| DATE | | RECIPIENT'S SIGNATURE (STAFF MEMBER) |

PART B - RESPONSE

| NAME | REG. NO. | CASE NO. |
|------|----------|----------|
| WILLIAMS, Robert | 18433-018 | 173090-F1 |

This is in response to your Administrative Remedy dated November 17, 1998.  Specifically, you request to retain the publications that were rejected on October 23, 1998.  You claim these publications were for medical use.

Eight publications entitled "Marijuana Hydroponics, Supermother's Cooking With Grass, Growing Extraordinary Marijuana, A Guide to Cannabis Under Fluorescents. Dr. Atomic's Marijuana Multiplier, The Marijuana Consumer's and Dealer's Guide, Super Grass Grower's Guide, and The Pot Book" were received at this institution addressed to you.  In accordance with Bureau of Prisons Program Statement 5266.08 "Incoming Publications," the warden may reject material sent to an inmate if it is detrimental to the security, good order, or discipline of the institution.   Specifically, these publications detail how to grow and cook marijuana which is an illegal drug.

Based on the above information, the relief you seek is denied.

WARDEN

12 4/98

DATE

12-22-98

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

98##  ))

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From. __Williams, Robert__ ____18433-018____ ____Creek-A____ ____F.C.I., Marianna-FL.____

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A—REASON FOR APPEAL** First of all, my BP-10 reponse was due on January 19, 1999. As of to-day's date of January 24, 1999, I have not received any response, neither have I received any notice of extension. As provided in **Program Statement 1330.13, §542.18**, I consider the absence of a response to be a denial at that level. Accordingly, I'm unable to enclose a copy of the BP-10, and it's respnse, however, perhaps you can have the Regional Office fax it to you. Never-theless, I am enclosing a copy of the BP-9, and it's response, as I'm required to do. I totally disagree with reason for rejecting my publication, and the use of **Program Statement 5266.08** is an abuse of authority, as well as an outright violation of my **Constitutional First Amendment Right**, and also unjustly deprives me from obtaining medical knowledge of the least expensive way of receiving the medication that has proven to be the most effective form of treatment with the least side effects for several illnesses and diseases I suffer. Ironically, I'm seeking any treatment of the drug in any form, neither am I attempting to order any seeds or drugs. My only interest at this time is to gain medical knowledge of information in concern of the least expen-sive way of receiving the medication, especially now while I can see good enough to read. Also, I am a member of **Americans For Medical Rights**, however, I do not smoke marijuana but I certainly would consider it if prescribed to me by a medical doctor upon my release, as an alternative with the least side effects. Although marijuana is illegal, the material I ordered is not ille-gal, neither is the company I ordered from. My receiving the books I ordered is certainly not

__January 24, 1999__  detrimental to the good order and security _Robert Williams_

DATE          of this institution. **Annul Rejection**          SIGNATURE OF REQUESTER

**Part B—RESPONSE**

---

DATE

ORIGINAL: RETURN TO INMATE

**Part C—RECEIPT**

GENERAL COUNSEL

CASE NUMBER: __173090__

CASE NUMBER: _____

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

USP LVN          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL          Previous editions not usable          BP-231(13)
APRIL 1982

                    REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: FEBRUARY 10, 1999


FROM: ADMINISTRATIVE REMEDY COORDINATOR
      BOP CENTRAL OFFICE

TO  : ROBERT WILLIAMS, 18433-018
      MARIANNA FCI     UNT: CREEK     QTR: C02-202L
      3625 FCI ROAD
      MARIANNA,  FL 32446


FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID        : 173090-A1       CENTRAL OFFICE APPEAL
DATE RECEIVED    : FEBRUARY 1, 1999
SUBJECT 1        : INCOMING PUBLICATIONS (INCL. REJECTION OR CONFISCATION)
SUBJECT 2        :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT PROVIDE A COPY OF THE REGIONAL APPEAL,
                 OR A RECEIPT, OR YOU DID NOT PROVIDE A VERIFIED
                 PHOTOCOPY.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS          : YOU MUST SUBMIT YOUR BP-10 FORM AND THE REGION'S
                   RESPONSE.

REGIONAL REQUEST FOR ADMINISTRATIVE REMEDY      PART B - RESPONSE
CASE # 173090-R1

To: Robert Williams, 18433-018
    FCI Marianna


Your Request for Administrative Remedy received on December 21, 1998, has been reviewed. You are appealing the Warden's rejection of the following publications entitled "Marijuana Hydroponics", "Supermother's Cooking With Grass", "Growing Extraordinary Marijuana", "A Guide To Cannabis Under Fluorescents", "Dr. Atomic's Marijuana Multiplier", "The Marijuana Consumer's And Dealer's Guide", "Super Grass Grower's Guide", and "The Pot Book". It is your contention that the material within these publications will provide you with medical treatment knowledge. You also contend that the publications are not illegal although marijuana is categorized as an illegal substance.

We have reviewed the objectionable material and support the Warden's decision to reject the above-referenced publications. Each publication provides details on the cultivation of marijuana and promotes individual use of the substance. Program Statement 5266.08, Incoming Publications, states, "The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." Also, "Publications which may be rejected by a Warden include but are not limited to publications which meet one of the following criteria: (3) It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs." Based on the above, the publications were appropriately rejected.

Your request for relief is denied. If dissatisfied with this response, you may appeal to the General Counsel, 320 First Street, NW, Washington, D.C. 20534. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.


January 20, 1999
Date

Carolyn V. Rickords
for Regional Director